BIBBY, Respondent, vs. THE WAUSAU LUMBER COMPANY, Appellant.

*October 5 — October 20, 1891.*

*Master and servant: Personal injuries: Contributory negligence: Defective machinery: Primary and secondary causes.*

1. The plaintiff, while working as head sawyer in defendant's mill, was injured by the saw running out of its course in a log and striking the iron head-block of the carriage, breaking the saw and other portions of the machinery, some of the fragments of which struck the plaintiff in the face. The evidence and special verdict — showing, among other things, that the plaintiff had full control of the speed of the carriage; that the log being sawed was a very crooked one; that it was the plaintiff's duty in such case to run the carriage slowly, but that in fact he was running it at an unsafe rate of speed; that a piece of slab from the log was drawn forward by the motion of the saw into the saw-cut, and was so wedged there as to turn the saw out of its course, so that it struck the head-block; and that the excessive speed of the carriage at the time prevented a quicker stoppage thereof — are *held* to show that the plaintiff was guilty of contributory negligence, notwithstanding a special finding by the jury to the contrary.

2. *Quære* whether, if defendant's negligence was not the primary cause of the accident, a defect in the machinery which, as a secondary cause, might have aided in producing the injury, could be regarded as actionable negligence.

APPEAL from the Circuit Court for *Marathon* County. This action was brought to recover damages for personal injuries sustained by the plaintiff September 15, 1885, while in the employ of the defendant in its steam saw-mill as head sawyer, by reason of the defendant's negligence. The particular negligence alleged is to the effect that the saw-mill, pulleys, rollers, and other machinery appurtenant thereto were too small, light, weak, old, decayed, and out of repair; that the roller-frame was unevenly and improperly constructed; that there was no spreader behind the saw; that the mill and machinery, at the time of the acci-

dent, were running at a high, careless, negligent, and dangerous rate of speed; that by reason thereof the mill, machinery, pulleys, belts, saw, and other machinery gave way and broke while running at a high rate of speed, and parts and pieces thereof flew and drove other articles before them with great velocity, and struck the plaintiff and greatly and permanently injured him. The answer consists of denials, and in effect alleges contributory negligence.

At the close of the trial the jury returned a special verdict to the effect (6) that the accident was caused in whole or in part by the saw running out of its course into the log and striking the iron head-block; (7) that the saw turned out of its course so as to strike the iron head-block by reason of the piece of slab wedging into the cut of the saw; (8) that the motion of the saw drew the slab into the saw-cut, but the slab did not strike the end of the strip of iron on the roller-frame, so as to drive the slab into the saw-cut; (13) that Lon Stevens was foreman of the defendant's mill, in charge of the machinery at the time of the accident; (1) that the defendant was guilty of negligence which caused the plaintiff's injury; (2) that such negligence did not consist, in whole or in part, of the pulley in the arbor being insufficient to stand the strain put upon it in operating the mill in the manner in which it had been ordinarily operated; (3) nor in leaving the iron strip projecting above the surface of the roller-frame; (4) but consisted, in whole or in part, in leaving off the cap on the pulley side of the tail end of the arbor; (16) that the defendant knew, or would have known by the exercise of ordinary care, that the cap was off the box at the tail end of the arbor; (5) that the plaintiff did not know or have reasonable means of knowing that he was in personal danger by reason of such negligence; (9) that the plaintiff was running the carriage at an unsafe rate of speed at the time of the accident; (11) that the signal of the setter to stop was not given in time

to allow the plaintiff, if he saw it, to stop the carriage in time to prevent the accident; (10) that the plaintiff would have seen the signal of the setter in the exercise of ordinary care; (12) that the plaintiff was not in the exercise of ordinary care as head-sawyer at the time of the accident; (17) but the plaintiff was not guilty of negligence or want of ordinary care which directly caused or contributed to the accident; (18) that the plaintiff's damages are assessed at $3,500; (19) that the jury find for the plaintiff. Neither the fourteenth nor fifteenth question required any answer, and none were returned.

Upon such verdict the court ordered judgment in favor of the plaintiff, from which the defendant appeals.

For the appellant there was a brief by *Silverthorn, Hurley, Ryan & Jones,* and oral argument by *W. C. Silverthorn.*

For the respondent there was a brief by *Raymond & Brennan,* and oral argument by *John Brennan.*

CASSODAY, J.    At the time of the accident the mill was · sawing at the rate of from 50,000 to 60,000 feet of lumber, board measure, in twelve hours.    This was done by a circular saw sixty inches in diameter, making from 850 to 900 revolutions per minute.    The saw was attached to the end of a horizontal iron or steel shaft or arbor, some eight or ten feet in length, by a nut pressing it between two collars, six inches in diameter, with two lug-pins passing through the saw to hold it firm.    This shaft or arbor rested in iron or steel boxes, upon two bearings on the respective sides of a wooden frame,— one very near the collar against the saw, several inches wide, covered with an iron or steel cap, firmly fastened down with bolts; and the other at the end in a similar box, but without any cap, the absence of which cap is referred to in the fourth, fifth, and sixteenth findings of the jury, mentioned in the foregoing statement.    Upon about the middle of this shaft or arbor there was a cast-iron

Bibby vs. The Wausau Lumber Co.

pulley, weighing somewhere from 300 to 700 pounds, and about twenty-eight inches in diameter and nineteen inches wide on the surface, over which there was a belt of similar width attached to the machinery below, and by which the saw was run. That pulley is referred to in the second finding of the jury mentioned in said statement. Below and against such belt there was a heavy device for holding the belt firm on the pulley mentioned. On a plane with the center of the saw, or a little below, there was a steel guide to the saw, firmly bolted upon the corner of the frame mentioned, and passing around just in front of the saw, and coming up on each side of it just back of the saw-teeth and almost to the plate of the saw. The logs were received over a roll-way which extended to nearly in line with the saw, and some eight or ten feet in front of it, and from there were rolled onto the blocks or head-blocks of the carriage made for that purpose. These head-blocks, mentioned in the sixth and seventh findings of the jury, were some eight or ten feet apart, about six inches wide, and the top of each was of cast-iron, with a steel facing, and, when passed by the saw, the end came within about half an inch of it. The log on the carriage at the time of the accident was very crooked, twelve feet long, fourteen inches in diameter, and fastened with dogs to the head-blocks. A few feet from the end of the log towards the saw was a chair, facing the log, and occupied by a man known as the "setter," mentioned in the tenth and eleventh findings of the jury, and who, by means of a lever in front of him, set the log so as to cut off a slab or board of the desired thickness. Behind the saw, and outside of the carriage track, was a frame some five or six feet wide, in which were rollers to carry off the slabs and boards taken from the log. On the top of the side of that frame towards the carriage track was an iron strap, referred to in the third and eighth findings of the jury, the end of which was about four feet

back of the saw, and the face of which, together with the top of such rollers, was about on the same plane with the top of the head-blocks.

The power which moved the carriage with the log upon it back and forth upon the track was by steam-feed, and was entirely separate and independent from the power which propelled the saw, and was operated and controlled wholly by the plaintiff, as head sawyer, by means of an upright lever about four feet from the line of the head-blocks, and a little more than that distance from the saw, and partially in front of it, and about half that distance from the wooden covering to the pulley and arbor. In operating the carriage the plaintiff held the upper end of the lever with his left hand, standing between the lever and the log or carriage, and facing the saw, the log, and the "setter;" and then, when the log was properly set, he would move the lever the way which would force the log against the saw until it passed through it; and then he would move the lever in the opposite direction, and that would reverse the steam, and send the log and carriage back in front of the saw, to be reset for a repetition of the operation. The upper end of the lever only moved through an arc of about one foot, and when the lever was straight up the steam would be shut off, and the carriage and log would stop whenever the momentum ceased,— which would be in a distance of four feet or less, depending upon the speed at the time.

The log in question was very crooked. The plaintiff first took a slab from the side of the log on which the middle was bent outward, and then turned it down on the sawed side and took off another slab, and then turned it down on that side and started the saw in, so that the slab was at first quite thick, and then became very thin near the middle of the log, and finally broke off, and, in the language of the sixth, seventh, and eighth findings of the jury, the piece of

slab so broken off was drawn forward by the motion of the saw into the saw-cut, and, by reason of the piece of slab so wedging into the cut of the saw, the saw was turned out of its course, so as to strike the iron head-blocks, and thereby, in whole or in part, caused the accident.

It appears from the evidence that the place where the saw so struck the head-block was some four inches out of the true line of the saw. The manifest result was, what the undisputed evidence clearly shows, that by reason of the saw being thus drawn out of its course the prong of the guide to the saw, on the side towards the log mentioned, first broke; that that allowed the saw to be drawn still further out of its course, until it struck the head-block, as mentioned; that such striking of the head-block broke off about one-third of the saw and several teeth from the remaining portion; that such striking of the head-block presented an irresistible obstacle from below, which necessarily lifted the saw, and tore off the cap bolted down over the arbor near the saw mentioned, and also broke or burst the pulley mentioned, and destroyed the wooden covering to the same; and that some portion of some of the fragments struck the plaintiff in the face, and resulted in the destruction of his eye. The strain upon the several parts mentioned, by reason of the saw thus striking the solid head-block, must, from the very nature of things, have been very severe. The belt around the pulley must have been very strong, or it would have broken before the pulley, and thus relieved the latter and the arbor from the power below. Such strain on the belt necessarily tended to hold the arbor in place, especially the end furthest from the saw, known as the "tail end." The jury found that the pulley was sufficient to stand the strain put upon it in the ordinary operation of the mill, and hence that no negligence was attributable to its insufficiency.

The learned and able counsel for the plaintiff insists that

the jury properly found that the defendant's negligence consisted in whole or in part in knowingly leaving the cap off the tail end of the arbor. It is quite obvious, in the very nature of things, that, so long as the strap around the pulley remained unbroken, that end of the arbor would necessarily remain in place. Had the cap on the saw end of the arbor remained firm, and the strap broken before the pulley, there might have been some force in arguing that, had that cap been on and securely bolted down, it would have partially relieved the strain on the strap and pulley, and served to hold that end of the arbor in place.

It is true, the defendant knew that cap was off, and so did the plaintiff. The plaintiff testified that he had worked in this mill from the spring previous to the accident, and also the fall before; that "the cap on the outer arbor from the saw was off,— that is, the end next to the pulley. . . . That cap was cast-iron. It was not under this decking that covered the pulley. It was in plain sight. *I had seen it all summer;* I noticed it quite frequently; *had never said anything about it. Question.* Do you consider it careless to have it in that way? *Answer. No; I don't know as it was. Q.* Do you know now it is? *A.* Yes; I know now it is. . . . *Q.* Do you pretend to say on the stand that it was on account of the cap being left off there that caused the accident? *A. I didn't say so.* I don't know what the cause of the accident was. This box where the covering was left off used to heat when it was left on. I know that because I worked on it,— discovered it of my own knowledge."

It is very obvious that neither the defendant nor the plaintiff regarded the absence of such cap as negligence or carelessness; hence the fifth finding of the jury, to the effect that the plaintiff did not know or have reasonable means of knowing that he was in personal danger by reason of such absence. And yet the plaintiff testified that he had worked in mills sawing logs into lumber as head saw-

yer for about five years; that for the two previous seasons he had used steam-feed; that he had also worked in mills five or six years before he became a head sawyer. As long as the cap at the saw and the pulley remained firm, and the strap unbroken, it is manifest from the very nature of things that the absence of such cap from the tail end of the arbor could cut no figure in injuring the head sawyer at his post. It is quite obvious from the testimony quoted that the plaintiff himself did not regard such absence of such cap as the primary cause of his injury, but at most a secondary cause, set in motion by the saw being drawn out of its course, and the breakages that followed.

The fourth finding of the jury, to the effect that the defendant's negligence consisted " in whole *or in part* " in such absence of such cap, can only be justified on the same theory,— that is to say, that after the primary cause of the accident produced the breakages mentioned, the fact that the cap was off aided in throwing fragments into the plaintiff's face. If the defendant's negligence was not the primary cause of the accident, it may be very doubtful whether such mere incident, which might or might not aid in producing the injury, depending upon the character and place of the breakage, could be regarded as actionable negligence.

The same is true of another branch of counsel's argument, to the effect that, had not the defendant, in the spring before the accident, put two lug-pins in the collars which held the saw, instead of having only one, as previously, such single lug-pin would have broken when the saw struck the head-block, and that that might have prevented the tearing off of the cap next to the saw and the breakage of the pulley. Since the strain necessarily forced the breakage of the weaker parts of the machinery, the argument is, in effect, that, if the stronger parts had been made very much weaker, then the parts that did break, or some of them, would thereby have been saved from breakage by the

breakage of such other parts. In other words, it is simply an argument to the effect that, had the primary cause of the accident, which was the saw running out of its course, produced some different result, then the plaintiff would have been less likely to have been injured.

This leads us to consider the other findings of the jury, bearing directly upon such primary cause of the accident. As indicated, the log was very crooked, and the movement of the carriage with the log upon it, back and forth, was wholly under the management and control of the plaintiff as head sawyer. His duty required him to keep a constant lookout upon the log, the cutting of the saw, and the setter. By the ninth, tenth and twelfth findings, the jury in effect found that the plaintiff was running the carriage at an unsafe rate of speed at the time of the accident; that he would have seen the signal of the setter in the exercise of ordinary care; and that he was not in the exercise of ordinary care as head sawyer at the time of the accident. Upon these questions the plaintiff testified, in effect, that he, as head sawyer, could make the carriage go back and forth by simply making the lever go back and forth. That he could stop the carriage pretty quick, the quickness depending upon the speed with which it was going at the time. That when the saw was laboring in a cut, having all she could do, it was the duty of the head sawyer to run the carriage slowly,— to slow up by taking off the feed. That when the saw was laboring,— having about all she could do, the speed should be lessened, and "it would be a mistake not to do that. *Question.* It would be negligence on the part of the sawyer not to do it? *Answer. If he didn't stop, yes.*" That it required more than usual care to saw a very crooked log. That the head sawyer had to be on his taps all the while, but more particularly so when sawing a crooked log. The undisputed evidence shows in the case at bar that the log was very crooked, and the speed excessive, and that the

saw necessarily labored very hard, since it was drawn several inches out of its course. The plaintiff's negligence, therefore, contributed directly to the primary cause of the accident. It is true the jury found that the signal of the setter to stop was not given in time to allow the plaintiff thereafter to stop the carriage in time to prevent the accident, but, as indicated in the plaintiff's testimony, the excessive speed of the carriage at the time prevented a more sudden stop. Besides, the plaintiff, on his own testimony, was required to take notice of the condition of things which, he admits, necessitated the running at a slower speed.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.

WINSLOW, J., took no part.